UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

TERESA DIANE PRICE,                    )
                                       )
              Plaintiff,               )
                                       )        No. 1:10-CV-129
v.                                     )
                                       )        *Collier / Lee*
MICHAEL J. ASTRUE,                     )
Commissioner of Social Security,       )
                                       )
              Defendant.               )

## REPORT AND RECOMMENDATION

      Plaintiff Teresa Diane Price ("Plaintiff") was denied supplemental security income ("SSI")

by the Commissioner of Social Security ("Commissioner" or "Defendant"), and she now appeals that

denial.[1]  Plaintiff, who suffers from depression and anxiety, contends that the Administrative Law

Judge ("ALJ") who heard her claim erred in concluding she was not disabled because she was able

to perform her past relevant work.  Plaintiff has moved for summary judgment, seeking reversal of

the Commissioner's decision and an award of benefits [Doc. 9].  In the alternative, Plaintiff moves

to remand her case for the consideration of new evidence [Doc. 13].  Defendant, in response, has

moved for summary judgment [Doc. 15].  For the reasons stated below, I **RECOMMEND** that:

Plaintiff's motion for summary judgment [Doc. 9] and motion for remand [Doc. 13] be **DENIED**;

Defendant's motion for summary judgment [Doc. 15] be **GRANTED**; the decision of Commissioner

---

[1] This action is brought pursuant to 42 U.S.C. §§ 1383(c)(3) and 405(g), which provide for
judicial review of the final decision of the Commissioner denying SSI benefits.

be **AFFIRMED**; and this action be **DISMISSED WITH PREJUDICE**.

## I. ADMINISTRATIVE PROCEEDINGS

In February 2006, at the age of 31, Plaintiff applied for SSI benefits, alleging disability due to nerves and panic attacks since January 2006 (Tr. 63, 74, 79). Plaintiff's claim was denied initially and on reconsideration after the agency determined Plaintiff's mental problems were not severe enough to keep her from working (Tr. 38, 47). She requested a hearing (Tr. 51), which was held on November 15, 2007 (Tr. 21). The ALJ, by decision dated March 27, 2008, determined Plaintiff was not disabled (Tr. 9-18). Plaintiff appealed the decision to the Appeals Council and, in support, submitted medical records dated from August through October of 2008 (Tr. 2). In March 2010, the Appeals Council denied Plaintiff's request for review, reasoning that the records were not probative of Plaintiff's condition during the relevant time period (Tr. 2). Consequently, the ALJ's decision became the final, appealable decision of the Commissioner (Tr. 1).

## II. DISABILITY DETERMINATION PROCESS

The Social Security Administration determines eligibility for disability benefits by following a five-step process. 20 C.F.R. § 404.1520(a)(4)(i-v).

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment-i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities-the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from

doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant
is not disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009). The claimant bears the burden of proof at the first four steps. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). In this appeal, Plaintiff challenges the ALJ's conclusion at step four that she was able to perform her past relevant work as a fast food worker.

## III. FACTUAL BACKGROUND AND ALJ'S FINDINGS

### A. Plaintiff's Allegations of Disability and Hearing Testimony

From 2003 until January 2006, Plaintiff worked at Hardees and Taco Bell, but she claimed she was fired when she had a panic attack at work (Tr. 79-80, 95-96). Plaintiff alleged she had difficulties with attention and following instructions, and she was nervous and afraid (Tr. 92-93). She claimed she would "freak out" at work, and as a result, she mostly "stay[ed] home and to [her]self" (Tr. 79). Plaintiff also attributed her alleged disability to dizziness; she said she was fired because she could not walk without holding onto something (Tr. 93).

Similarly, at the hearing before the ALJ, Plaintiff testified she was "too nervous" to go back to work at Taco Bell (Tr. 30). She testified that her employer told her she "was incapable of doing [her] job" (Tr. 25). Until shortly before the end of her employment, however, the restaurant's general manager reported that Plaintiff's work performance was satisfactory (Tr. 106). According to that manager, Plaintiff was able to understand and carry out both simple and detailed instructions, maintain attention and concentration, perform assigned tasks at a consistent pace, work with others, and respond appropriately to changes in her work. Toward the end of her employment, on the other

hand, Plaintiff reportedly did not respond to stresses appropriately and she required frequent breaks for stress-related reasons (Tr. 106-07). Plaintiff told her employer she was having personal and marital problems at home, and she cried a lot (Tr. 107).

Plaintiff reported she had an 11th-grade education which included special education classes in math and reading (Tr. 85, 257). She claimed she did not go out much because she could not walk without holding onto a wall and could not drive (Tr. 90). Instead, Plaintiff said she mostly "s[a]t around the house," although she also did laundry and went grocery shopping with her husband (Tr. 87, 90). Plaintiff stated she enjoyed working puzzles (Tr. 23, 87, 91). Plaintiff's sister, with whom Plaintiff had been living for a month, generally corroborated her allegations (Tr. 103-05). She also described how Plaintiff pulled on her hair, causing bald spots (Tr. 103).

## B. Plaintiff's Treatment History

### 1. Evidence in the Record Before the ALJ

Plaintiff's medical records begin in July 2003, when she was treated by the Family Medical Center for "[d]epression with some insomnia" (Tr. 163). She reported at that time that her medication, Celexa, "ha[d] helped with her anxiety so much and she ha[d] been able to keep a job [then] for four months, which [wa]s longer than she had previously been employed (Tr. 163). Nonetheless, her doctor "hesitant[ly]" changed her antidepressant medication from Celexa to Lexapro because she was suffering from anorgasmia (Tr. 163). Plaintiff was instructed to continue taking Trazadone, "which seem[ed] to be working well." (Tr. 163). Later that month, however, Plaintiff reported she had stopped taking Trazadone because "it just made her feel so tired" (Tr. 159). Her medications were again adjusted (Tr. 159).

Plaintiff often reported that external stressors affected her mental state. In April 2005,

Plaintiff said she had been "getting nervous and . . . restless," and she reported stress from her mother's illness (Tr. 154). According to the treatment note, she "appear[ed] mildly depressed" at that time, and her depression was "chronic" but "stable" (Tr. 153-54). In September 2005, Plaintiff reported "a lot of anxiety" and "verbal abuse" from her husband (Tr. 153). Her physician recommended counseling at that time (Tr. 153). She began counseling with the Hiwassee Mental Health Center ("Hiwassee") the following month, at which time she was given a Global Assessment of Functioning ("GAF") score of 60 (Tr. 233). She told her counselor that working helped her mental state, and she was satisfied with her medications (Tr. 232). In October 2005, she explained that her major stressors were marital difficulties and her mother's illness (Tr. 232). That same month, Plaintiff was assigned a GAF of 75 (Tr. 225).

During her treatment at the Family Medical Center, Plaintiff denied suicidal thoughts (Tr. 152, 153). Similarly, when she sought emergency room care in September 2005 for anxiety, she denied having thoughts of harming herself (Tr. 184). Only two months later, however, in November 2005, she arrived at the Cleveland Community Hospital emergency room "hearing voices," not sleeping or eating, and with "const[ant] intrusive thoughts about suicide" (Tr. 172-73, 175). At that time, she was "childlike, withdrawn, [and] anxious," and she reported her stressors as a "worry about health problems and [a] strained marital relationship." (Tr. 175). Shortly before this episode, Plaintiff had ceased taking one of her medications, Effexor, which she found unhelpful, and Paul G. Smith, D.O., prescribed Wellbutrin instead (Tr. 245). Plaintiff seemed to attribute her panic attacks to this change in medications (Tr. 227).

Plaintiff was discharged from the emergency room to Pine Ridge Treatment Center for an interview (Tr. 205). Plaintiff complained she could not concentrate at work because of nerves (Tr.

5

205). She was "very tearful" and "paranoid about dying," but she denied hearing voices (Tr. 205). She was afraid she would overdose, and she reported that her husband was "pushing" her (Tr. 205). Plaintiff was "baseline low functioning, with poor coping skills and a minimal support system" (Tr. 220). It was noted that "[h]igh level anxiety [wa]s normal for [Plaintiff]," and that she "fixate[d] and obsesse[d] on a variety of minor concerns" (Tr. 217). She was referred to Moccasin Bend, a mental health treatment facility, "for safety and stabilization" (Tr. 174-75). The referring physician noted her "long history of severe mental illness: Depression, Anxiety, [and] Borderline Intellectual Functioning." (Tr. 175). Upon admission, Plaintiff was assigned a GAF of 45, and was later assigned a GAF of 20 (Tr. 302-03). Several days later, however, Plaintiff was assessed with a GAF of 60 (Tr. 228).

In December 2005, Plaintiff was evaluated by J. Glynn Newman, Jr., M.D., who described her affect as euthymic (Tr. 239). Dr. Newman assigned a GAF of 37 (Tr. 240). By January 10, 2006, shortly before she lost her job, Plaintiff reported that her medication was "helpful," without side effects, and she was "doing better at work" (Tr. 236, 238). She complained, however, that she was having difficulty controlling her anger (Tr. 236, 238). At that time, Dr. Newman assigned a GAF of 42 (Tr. 235). The next month, not long after she lost her job, Plaintiff complained to Dr. Smith that she was experiencing dizziness and increased mood swings (Tr. 244). In March 2006, Plaintiff was having trouble with daily activities, and she reported intense anxiety, depression, and panic attacks (Tr. 243). Dr. Smith advised Plaintiff that she needed to see a psychiatrist, but she refused (Tr. 243). A week later, Plaintiff's sister told Dr. Smith that Plaintiff had made comments about hurting herself (Tr. 242). Dr. Smith insisted that Plaintiff see a psychiatrist, and Plaintiff agreed to do so (Tr. 242).

In June 2006, Plaintiff was again treated by Dr. Newman, whom she told she was "getting out more often," though she was "still nervous" (Tr. 290). Dr. Newman diagnosed Plaintiff with panic disorder with agoraphobia and again assigned a GAF of 42 (Tr. 290). The next month, Plaintiff reported she was having panic attacks "every time she le[ft] the house" (Tr. 291). Her affect was described as anxious and dysphoric (Tr. 291). Plaintiff saw Dr. Newman again in October 2006, at which time she reported she was "doing pretty good" and "getting out more" (Tr. 292). Her mood was "pretty good" and her affect was euthymic at that time (Tr. 292). Dr. Newman did not adjust her GAF score (Tr. 292). On November 1, 2006, Plaintiff stated that she "sometimes" was nervous, but was "doing okay" (Tr. 295-96). Her affect remained euthymic, and she denied any side effects from her medications (Tr. 296). Her GAF score, according to Dr. Newman, remained at 42 (Tr. 295). In March 2007, she reported she was "fine" and had "no side effects" from her medications (Tr. 321). Then, in July 2007, she ran out of her medications and her condition was "not too good" (Tr. 322). "[P]rior to running out of medications," however, "[t]hings were going okay" (Tr. 322). Dr. Newman refilled her prescriptions, and Plaintiff stated she was "fine" again in October 2007 and in January 2008 (Tr. 322-24). At each visit, her GAF was noted to be 42. Plaintiff's attorney speculated that this GAF score may have been repeated, visit after visit, without reassessment (Tr. 29).

While she was being treated by Dr. Newman for her mental health complaints, Plaintiff continued to see Dr. Smith for other "chronic medical problems" (Tr. 311-15). Dr. Smith did not mention Plaintiff's mental health complaints, but he noted in November 2006 that Plaintiff was taking her medications "satisfactorily" (Tr. 310). Dr. Smith noted that Plaintiff denied dizziness at each visit between November 2006 and August 2007 (Tr. 310-15).

## 2. Evidence Submitted After the ALJ's Decision

Plaintiff has also submitted more recent medical records not contained in the administrative record, many of which relate to her complaints of dizziness. In April 2008, for instance, Plaintiff told Dr. Newman she was having "balance problems," but that her doctors told her it was "psychological" [Doc. 14-1 at 59]. In August 2008, she was "still having chronic problems with balance," so Dr. Smith referred her to an ear, nose, and throat doctor, Kenneth H. McCarley, M.D., who diagnosed dizziness of an "unknown etiology" [Doc. 14-1 at 4, 5, 48]. Dr. McCarley ordered an MRI, which revealed nothing abnormal [Doc. 14-1 at 2]. Plaintiff told Dr. McCarley that her "unsteady feeling" affected her more when she went out in public [Doc. 14-1 at 4]. The following month, however, she reported that it also bothered her at home [Doc. 14-1 at 5].

In October 2008, Plaintiff complained of dizziness, headache, nausea, and tingling in her fingers and toes [Doc. 14-1 at 7]. The dizziness affected her approximately twice per month [Doc. 14-1 at 7]. Stress and emotional upset, she reported, increased her symptoms [Doc. 14-1 at 7]. That same month, Plaintiff was prescribed with a walker due to an unstable gait and vertigo [Doc. 14-1 at 9]. A year later, however, in October 2009, Plaintiff denied headache or dizziness [Doc. 14-1 at 22]. Finally, in December 2009, her mental condition was reported as "relatively stable" with a GAF of 55 [Doc. 14-1 at 62-63].

## C. Medical Opinions in the Record

In May 2006, Ann Ramey, M.S., performed a consultative examination, which consisted of an interview and a mental status examination (Tr. 256-61). Plaintiff reported that she was fired from her job because her panic attacks had increased (Tr. 256). She stated that during a panic attack, her hands shook and she pulled her hair out (Tr. 256). Ms. Ramey observed that Plaintiff pulled out her

8

hair during the examination (Tr. 259). Plaintiff said she left the house only a couple of times per week, and going outside "bother[ed] her" (Tr. 257). She reported that she performed household chores, including cooking, mopping, sweeping, vacuuming, and cleaning the bathrooms, and she read and worked puzzles (Tr. 258). Ms. Ramey did not believe that Plaintiff was malingering, dramatizing, or fabricating (Tr. 259-60). She diagnosed Plaintiff with an anxiety disorder and panic disorder without agoraphobia (Tr. 260). As for Plaintiff's ability to function in a work setting, Ms. Ramey opined that Plaintiff's ability to understand, her concentration, her problem solving skills, and her adaptation were all mildly restricted, that her social interactive patterns were moderately restricted, and that her recall and persistence to task were adequate (Tr. 260).

Andrew J. Phay, Ph.D., a reviewing consultant, offered a similar opinion later that same month. He opined that Plaintiff was mildly limited in activities of daily living and in maintaining concentration, persistence, and pace, and she was moderately limited with respect to social functioning (Tr. 272). He stated that she was likely to have some, but not substantial, difficulty in working with the general public, supervisors, and peers (Tr. 278). Dr. Phay opined further that Plaintiff appeared able to remember and perform both simple and detailed tasks and to complete a normal work week with acceptable performance and productivity (Tr. 278). In his opinion, Plaintiff was able to set and pursue realistic work goals (Tr. 278).

Michael N. Ryan, M.D., a reviewing consultant, offered an opinion with respect to Plaintiff's physical work limitations. He noted that Plaintiff had complained of dizziness, but her treating physician had not done a "workup" (Tr. 285). Dr. Ryan speculated that the dizziness might have been a side effect of Plaintiff's medications (Tr. 285). He believed Plaintiff's complaints were "partially credible," and he opined that she should avoid all exposure to hazards such as machinery

or heights, but he concluded that she had no other physical limitations (Tr. 284-85, 287).

### D. ALJ's Findings

The ALJ found that Plaintiff had two severe impairments: depression with a mood disorder and anxiety disorder with panic attacks (Tr. 11). He found, however, that these impairments did not meet the criteria of any presumptively disabling impairment (Tr. 14). The ALJ acknowledged that the period in late 2005 and early 2006 was a "bad year" for Plaintiff (Tr. 30, 32). The question in the ALJ's mind, therefore, was whether that period was merely a "spike" or whether Plaintiff had "reached a new sort of low" (Tr. 30). Ultimately, in assessing Plaintiff's residual functional capacity ("RFC"), the ALJ concluded that Plaintiff's condition had improved (Tr. 17). He reasoned that Plaintiff's more serious symptoms occurred when she stopped taking her medications but were less serious when she resumed taking her medications as prescribed (Tr. 15-16). The ALJ also noted that Plaintiff had not experienced any episodes of decompensation in 2007 (Tr. 17). Based primarily on Ms. Ramey's evaluation, the ALJ found Plaintiff had the RFC to perform unskilled work at any exertional level (Tr. 15, 17). Thus, because Plaintiff's past relevant work as a fast food worker is classified as "unskilled," the ALJ found she could still perform that job (Tr. 17). Accordingly, he concluded Plaintiff was not disabled (Tr. 17-18).

## IV. ANALYSIS

Plaintiff challenges the ALJ's finding at step four of the sequential evaluation process that

she retained the RFC to perform her past relevant work as a fast food worker.[2]  In the alternative, Plaintiff argues that her case should be remanded for consideration of evidence submitted after the ALJ rendered his decision.

### A.      Standard of Review

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence.  42 U.S.C. § 405(g); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters*, 127 F.3d at 528).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Furthermore, the evidence must be "substantial" in light of the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Id.* (internal quotes omitted).  If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971).  The court may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility. *Garner*, 745 F.2d at 387.  The substantial evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.

---

[2] Asserting the ALJ should have found Plaintiff lacked the RFC to perform her past relevant work, Plaintiff argues the ALJ "committed error by failing to find her Disabled in spite of the medical proof in the file," and she "asserts that she established an inability to perform past relevant work" [Doc. 14 at 13].  She also argues "it was error to fail to elicit additional vocational testimony upon which to base a decision" [Doc. 14 at 14], which is ordinarily necessary only if a claimant makes it past step four.

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The court is under no obligation to scour the record for errors not identified by the claimant, *Howington v. Astrue*, 2009 WL 2579620, *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and arguments not raised and supported in more than a perfunctory manner may be deemed waived, *Woods v. Comm'r of Soc. Sec.*, 2009 WL 3153153, at *7 (W.D. Mich. Sep. 29, 2009) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (noting that conclusory claim of error without further argument or authority may be considered waived). Nonetheless, the court may consider any evidence in the administrative record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

Evidence submitted to the court after the close of administrative proceedings cannot be considered for purposes of substantial evidence review. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Similarly, where the claimant presents new evidence to the Appeals Council, but the Appeals Council declines to review the ALJ's decision, that new evidence may not be considered during review on the merits. *Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993). Instead, the new evidence can be considered only for purposes of remand pursuant to sentence six of 42 U.S.C. § 405(g), which authorizes the court to remand a case for further administrative proceedings "if the claimant shows that the evidence is new and material, and that there was good cause for not presenting it in the prior proceeding." *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996).

**B.     RFC Finding**

As noted, the ALJ found Plaintiff could perform unskilled work at any exertional level, and

he therefore found she could perform the job of fast food worker, which is classified as "unskilled" (Tr. 17). *See* Dictionary of Occupational Titles 311.472-010 (1991). Plaintiff argues that she is disabled due to her combination of diagnoses, but as the Commissioner argues, Plaintiff's diagnoses alone do not establish that she is incapable of working. *See Foster v. Bowen*, 853 F.2d 483, 488-89 (6th Cir. 1988). It is the ALJ's role—not a physician's—to determine the extent to which the claimant's diagnosed conditions impair her ability to work. *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010). To do so, the ALJ must consider the medical evidence and the claimant's testimony and assess the claimant's RFC. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). In view of the record as a whole, I **FIND** the ALJ's RFC finding is supported by substantial evidence.

In assessing Plaintiff's RFC, the ALJ gave "great weight" to the opinion of the consultative examiner, Dr. Ramey (Tr. 17). Dr. Ramey opined in May 2006 that Plaintiff's limitations in several functional areas were no more than moderate. Specifically, she opined that Plaintiff's recall and persistence were adequate, that her ability to understand, concentration, problem solving, and adaptation were only mildly impaired, and her social interactive patterns were moderately restricted (Tr. 260). The ALJ found this assessment to be consistent with the reviewing consultant's opinion and supported by clinical and objective evidence (Tr. 17). I find no error in either rationale. First, with respect to the functional areas mentioned by the ALJ, the reviewing consultant's opinion (Tr. 272) is substantially identical to the examining consultant's opinion (Tr. 260), and no other physician has offered any greater limitations with respect to those functional areas. Second, the ALJ's analysis of the clinical and objective evidence, which centers around his observation that Plaintiff's condition was no more than "moderately" limiting while she was taking her medications, was itself supported

by substantial evidence. When Plaintiff ceased taking one of her medications in late 2005, her symptoms increased (Tr. 227, 245), but when she was taking her medications properly, her symptoms were less severe (Tr. 232-33, 295-96, 310). Similarly, when she ran out of her medications in July 2007, she reported she was "not too good," but "things were going okay prior to running out" (Tr. 322).[3] With the exception of this single occasion in July 2007, Plaintiff told Dr. Newman at every visit during 2007 that she was either "fine" or "okay" (Tr. 321-24).

Furthermore, while substantial evidence supports the ALJ's RFC assessment, very little evidence supports the contrary position. To be sure, Dr. Newman consistently assigned Plaintiff a GAF score of 42, which the ALJ acknowledged reflected a "major" impairment in functionality (Tr. 13). The ALJ, however, discounted those scores. He concluded they were inconsistent with the other evidence, which showed Plaintiff had improved since the score was first assigned in January 2006 (Tr. 16-17). Indeed, Dr. Newman's own treatment notes reflect that Plaintiff's condition improved, but he did not adjust Plaintiff's GAF score accordingly. For example, in July 2006, Plaintiff was anxious and dysphoric (Tr. 291), but in October 2006, her mood was "pretty good" and her affect was euthymic (Tr. 292). Despite that improvement, Plaintiff's GAF score remained a 42. Additionally, as noted above, Plaintiff's own attorney speculated during the hearing that Dr. Newman's score was not reevaluated after it was first assigned (Tr. 29). I therefore **FIND** the ALJ

---

[3] The ALJ also found that Plaintiff's allegations of disability were belied by her daily activities, including household chores, preparing meals, occasional grocery shopping, and puzzles (Tr. 16). I do not reach the issue whether these limited activities are inconsistent with Plaintiff's allegations of disability, *see Kalmbach v. Comm'r of Soc. Sec.*, 2011 WL 63602, at *11 (6th Cir. Jan. 7, 2011) (unpublished), because the consultative examiner's opinion is itself substantial evidence supporting the ALJ's decision.

did not err in discounting Dr. Newman's GAF scores.[4]

Plaintiff has not specifically argued that the ALJ erred by failing to incorporate her dizziness into the RFC assessment, and the argument could therefore be considered waived.  *See Woods*, 2009 WL 3153153, at *7.  Plaintiff did, however, argue that her diagnoses include vertigo, and that her *combination* of impairments renders her disabled.  Giving Plaintiff the benefit of the doubt, therefore, I consider the argument.  Dr. Ryan credited Plaintiff's complaints of dizziness and opined that she should be restricted from exposure to hazards such as heights and machinery (Tr. 284), but the ALJ did not incorporate this restriction in Plaintiff's RFC.  On the other hand, Plaintiff consistently denied dizziness after November 2006 (Tr. 310-15).  Still, even if it was error to fail to restrict Plaintiff from exposure to work hazards, any such error would be harmless.  Plaintiff bore the burden of proof to show she could not perform her past work, *Moses v. Comm'r of Soc. Sec.*, 2010 WL 4536969, at *2 (6th Cir. Nov. 3, 2010), and she has not shown that the job of fast food worker requires any exposure to hazards.

Accordingly, I **CONCLUDE** the ALJ did not err in finding that Plaintiff could perform her past relevant work.

---

[4] Plaintiff has not defended Dr. Newman's GAF scores by invoking the "treating physician rule," which requires the ALJ to give good reasons for rejecting "medical opinions."  *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488 (6th Cir. 2010).  Some courts have held, however, that GAF scores are medical opinions subject to the rule.  *E.g.*, *Hawkins v. Astrue*, 2010 WL 3221863, at *4 n.1 (W.D. Ky. 2010) (explaining that while the Sixth Circuit Court of Appeals ("Sixth Circuit") has not held that GAF scores are medical opinions, they have nonetheless treated them as such in unpublished opinions).  *But see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) ("While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy.");  *Edwards v. Comm'r of Soc. Sec.*, 654 F. Supp. 2d 692 (W.D. Mich. 2009) ("A GAF score itself is not a medical opinion").  Even if Dr. Newman's GAF scores are "medical opinions," however, the ALJ gave a good reason to reject them.

### C.    Sentence Six Remand

In the alternative, Plaintiff seeks remand of her case for consideration of new evidence [Doc. 13].  As summarized above, Plaintiff's new evidence consists of medical records from late 2007 through December 2009 [Doc. 14-1].

Under sentence six of 42 U.S.C. § 405(g), the court may remand a case for consideration of new, material evidence, if the claimant shows "good cause" for failing to present it during the administrative proceedings.  *Cline*, 96 F.3d at 148.  The burden of proof is on the claimant to show that a remand is appropriate.  *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 653 (6th Cir. 2009).  Here, Plaintiff has presented some "new" evidence, consisting of medical records that did not exist when the ALJ closed the record in December 2007 (*see* Tr. 21, 32-34).[5]

### 1.    Evidence Dated After the ALJ's Decision

The novelty of a claimant's evidence, however, does not establish good cause for failing to present it during the administrative proceedings.  The claimant must also show that she could not have obtained the evidence earlier, while the administrative record was still open.  *Perkins v. Apfel,* 14 F. App'x 593, 598-99 (6th Cir. 2001).  Here, with respect to records dated after the ALJ's March 2008 decision, Plaintiff appears to meet the good cause requirement.  She could not have obtained them before the ALJ's decision, because they relate to treatment she received for her condition after the ALJ's decision.  For the same reason, however, the evidence dated after March 2008 is immaterial.

Evidence is material only when it is probative of the claimant's condition during the time

---

[5] One treatment note, dated November 30, is not "new."  *See Foster*, 279 F.3d at 357 (*quoting Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)) (defining "new" evidence as evidence "not in existence or available to the claimant at the time of the administrative proceeding").

period considered by the ALJ—here, the period between February 2006 and March 2008 (Tr. 17-18). *See Ferguson v. Comm'r of Soc. Sec.*, ___ F.3d ___, 2010 WL 5185848, at *8 (6th Cir. Dec. 23, 2010). In contrast, evidence showing a claimant's "subsequent deterioration in condition" is immaterial. *Id.* (*citing Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 478 (6th Cir. 2003)). Moreover, even when time-relevant, evidence can be considered material only if "there is a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Foster*, 279 F.3d at 357 (internal quotes omitted). Here, as noted, Plaintiff's new evidence relates primarily to her current condition at the time the records were made—*after* the ALJ issued his decision. A single treatment note from August 2008, which refers to Plaintiff's "chronic" problems with balance, might be interpreted to relate to Plaintiff's condition prior to March 2008 [Doc. 14-1 at 48]. By itself, however, this note does not create a reasonable probability that the ALJ would have reached a different conclusion about Plaintiff's condition prior to March 2008.[6]

### 2. Evidence Dated Before the ALJ's Decision

That leaves only the records dated between December 2007, when the ALJ closed the record, and March 2008, when the ALJ issued his decision. Those records, however, add nothing to an understanding of Plaintiff's mental impairments. They mention only unrelated complaints such as sore throat and ear pain [*e.g.*, Doc. 14-1 at 53], and they are therefore immaterial. Accordingly, I **CONCLUDE** Plaintiff has failed to meet her burden to show she is entitled to a remand under sentence six of 42 U.S.C. § 405(g).

---

[6] If Plaintiff believes her condition deteriorated prior to the ALJ's decision, her remedy is to file a new claim. *See Jones*, 336 F.3d at 478.

## V.    CONCLUSION

For the foregoing reasons, I **RECOMMEND:**[7]

(1)    Plaintiff's motion for summary judgment [Doc. 9] be **DENIED**.

(2)    Plaintiff's motion for sentence six remand [Doc. 13] be **DENIED**.

(3)    Defendant's motion for summary judgment [Doc. 15] be **GRANTED**.

(4)    The Commissioner's decision denying benefits be **AFFIRMED** and this action be **DISMISSED WITH PREJUDICE**.[8]

s/*Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[7] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party.  Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985).  The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general.  *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

[8] This document contains hyperlinks to other documents.  Such links are provided for the user's convenience only, and the Court does not guarantee their functionality or accuracy.  Any link which directs the user to a document other than the document cited in the text will not supersede the textual citation.  The Court does not endorse the content of, or any provider of, any document maintained by any other public or private organization.